**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1098**

GEORGE G. MONROE,

       Plaintiff - Appellant,

    v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

       Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Louise W. Flanagan, District Judge. (7:13-cv-00074-FL)

Argued: May 10, 2016          Decided: June 16, 2016

Before TRAXLER, Chief Judge, GREGORY, Circuit Judge, and Joseph F. ANDERSON, Jr., Senior United States District Judge for the District of South Carolina, sitting by designation.

Reversed and remanded with instructions by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Gregory and Senior Judge Anderson concurred.

**ARGUED**: William Lee Davis, III, Lumberton, North Carolina, for Appellant. Marc David Epstein, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland, for Appellee. **ON BRIEF**: Thomas G. Walker, United States Attorney, R.A. Renfer, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

TRAXLER, Chief Judge:

George Monroe appeals the Social Security Administration's denial of his applications for disability insurance benefits (DIB) and supplemental security income (SSI). Because we conclude that the administrative law judge erred by not conducting a function-by-function analysis of Monroe's limitations and by not adequately explaining his decision, we reverse and remand.

I.

In October 2007, Monroe filed applications for DIB and SSI, alleging disability beginning December 8, 2006, due to uveitis[1]; back pain, breathing and memory problems; anxiety; depression; and blackouts.

His applications were denied initially and on reconsideration in 2008, and he requested a hearing before an administrative law judge. Following the hearing, the ALJ (Judge Leopold) denied the applications as well. In 2011, however, the Appeals Council granted Monroe's request for review, vacated Judge Leopold's decision, and remanded to an ALJ for a new decision that would include determinations on several specific

---

[1] Dorland's Illustrated Medical Dictionary defines "uveitis" as "an inflammation of part or all of the uvea, the middle (vascular) tunic of the eye, and commonly involving the other tunics (the sclera and cornea, and the retina)." Dorland's Illustrated Medical Dictionary 1798 (27th ed. 1988).

issues. The Appeals Council decision noted that Monroe had filed subsequent DIB and SSI claims on May 7, 2010, and the decision specified that the ALJ on remand was to associate the files and issue a new decision on all claims.

A second ALJ (Judge Allen) then held a supplemental hearing in late 2011. He subsequently found that Monroe was not disabled from December 8, 2006, to February 7, 2012, the date of his decision.

Monroe lost his administrative appeal and filed a complaint in district court. Considering cross-motions for judgment on the pleadings, a United States magistrate judge issued a memorandum and recommendation (M&R). In the M&R, the magistrate judge recommended that the district court deny Monroe's motion, grant the Commissioner's motion, and affirm the denial of benefits. The district court indeed granted the Commissioner's motion, thereby upholding the benefits denial. Monroe has now appealed.

## Legal Background

Before discussing the evidence in the record and the ALJ's analysis thereof, we begin with an overview of the five-step sequential evaluation that ALJs must use in making disability determinations. The applicable Social Security Administration regulations set out the five-step process in significant detail.

We recently summarized the process in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015):

> [T]he ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

Id. at 634. The burden is on the claimant to make the requisite showing at the first two steps, see Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987), and if he fails to carry that burden, he is determined not to be disabled. At the third step, the burden remains on the claimant, see Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995), and he can establish his disability if he shows that his impairments match a listed impairment, see Mascio, 780 F.3d at 634-35.

However, if the claimant fails at that step, the ALJ then must determine the claimant's residual functional capacity (RFC), "which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect h[is] ability to work." Id. at 635 (quoting 20 C.F.R. § 416.945(a)(1)). In making this assessment, the ALJ "'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function

4

basis, including the functions' listed in the regulations."[2]  Id.

at 636 (quoting Social Security Ruling 96-8p, 61 Fed. Reg.

34,474, 34,475 (July 2, 1996)).  Only after such a function-by-

function analysis may an ALJ express RFC "'in terms of the

exertional levels of work.'"  Id. (quoting SSR 96-8p, 61 Fed.

Reg. at 34,475).

In determining a claimant's RFC, the ALJ must consider

"'all of [the claimant's] medically determinable impairments of

which [the ALJ is] aware,' including those not labeled severe at

step two."  Id. at 635 (quoting 20 C.F.R. § 416.945(a)(2)).  He

also must "consider all [the claimant's] symptoms, including

pain, and the extent to which [his] symptoms can reasonably be

accepted as consistent with the objective medical evidence and

---

[2] The listed functions include

the claimant's (1) physical abilities, "such as
sitting, standing, walking, lifting, carrying,
pushing, pulling, or other physical functions
(including manipulative or postural functions, such as
reaching, handling, stooping, or crouching)"; (2)
mental abilities, "such as limitations in
understanding, remembering, and carrying out
instructions, and in responding appropriately to
supervision, coworkers, and work pressures in a work
setting"; and (3) other work-related abilities
affected by impairments "such as skin impairment(s),
epilepsy, impairment(s) of vision, hearing or other
senses, and impairment(s) which impose environmental
restrictions."

Mascio v. Colvin, 780 F.3d 632, 636 n.5 (4th Cir. 2015) (quoting
20 C.F.R. § 416.945(b)-(d)).

5

other evidence." 20 C.F.R. § 404.1529(a); see 20 C.F.R. § 416.929(a). "When the medical signs or laboratory findings show that [the claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [his] symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [his] symptoms limit [his] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

Once the ALJ has determined the claimant's RFC, the ALJ then proceeds to step four, where the burden rests with the claimant to show that he is not able to perform his past work. See Bowen, 482 U.S. at 146 n.5; Mascio, 780 F.3d at 635. If he successfully makes that showing, the process proceeds to step five. See Mascio, 780 F.3d at 635.

"At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." Id. (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." Id. If the Commissioner satisfies that burden, then the claimant is

6

found to be not disabled and his benefits application is denied. See id.

Testimony

Having provided this background, we will now summarize the evidence before the ALJ, as it is relevant to this appeal, including testimony, medical records, and other evidence. Then we will discuss the ALJ's analysis, before moving on to address the legal issues Monroe raises.

At the time of the hearing in late 2011, Monroe was 32. He testified he left high school in his senior year because of daytime tiredness, confusion, and seizures. His work record was spotty in his early years after school.

He reported that in 2007, when he was 27, he was working as a dockworker when he went temporarily blind in his left eye. He testified he was nodding off and falling asleep and having memory lapses and blackouts, and was diagnosed with sarcoidosis. He went to see Dr. Somnath Naik, underwent a sleep study, and was diagnosed with narcolepsy[3] and sleep apnea.

Monroe testified that he uses a continuous positive airway pressure (CPAP) machine. He testified that the CPAP had "done a little . . . but there's always a vague like drifting type

---

[3] Dorland's Illustrated Medical Dictionary defines "narcolepsy" as "recurrent, uncontrollable, brief episodes of sleep, often associated with hypnagogic hallucinations, cataplexy, and sleep paralysis." Dorland's, at 1098.

7

feeling . . . at all times" and he also "still ha[s] sleep problems sometimes like I drift off and just nod off and fall to sleep." A.R. 87. Monroe testified regarding the spaced-out feeling that, when it is happening, he really needs to just wait for it to pass. He stated that Dr. Naik wanted to prescribe him medication but that he could not afford it.[4]

Asked to describe his episodes of extreme sleepiness or blackouts, Monroe testified:

> I can say that the fatigue is usually pretty extreme. I do better sometimes when I can get a little more rest but I . . . work at the storehouse, I can be sitting and I'll just drift off, I'll just nod off. And as far as the seizures they stated them as absence seizures a while back. I basically just freeze up, I can even be talking to somebody and I'll just freeze. And I . . . had to grow to notice it myself because you know if it's happening to you I didn't really notice it at first . . . .

A.R. 93. Monroe testified that the episodes happen "about two or three times a day." A.R. 93. He said they seem more prevalent when "there's a lot going on, if there's a little confusion or if I'm where I have to move back and forth a lot." A.R. 94. He also testified that he had fallen asleep while driving before as well. Monroe reported that he usually can only wait out these episodes until they pass.

---

[4] Monroe's attorney, in her opening statement at the hearing, represented that Monroe's then-recent medical records were "quite sparse" because he had not had insurance and was going without treatment. A.R. 69.

Monroe also testified that he suffered from chronic bronchitis. He reported having problems sustaining his breath and he stated that he thought he could walk a block, but he would have to walk slowly. He claimed that even folding clothes sometimes tires him out so much that he needs to sit to catch his breath. He stated that he volunteers at a church and during the day he sits down and rests at least three or four times a day, usually for a few minutes.

He also testified that he suffered from neck and back pain as a result of multiple automobile accidents. And he reported chest and knee pain as well.

Regarding his eye problems, Monroe represented that they were under control, although he still had some problems at times. He also reported that anxiety and depression, which had been problems for him in the past, were under control.

A vocational expert (VE) also testified at the hearing. In questioning the VE, the ALJ described the following hypothetical person:

> Now, if you assume a hypothetical individual who has the same age, education and work experience as the claimant and has an RFC to perform light exertional work. This individual should only have occasional climbing of stairs or ramps, only occasional bending, balancing, stooping, crawling, kneeling or couching. This individual should never climb ropes, ladders or scaffolds, this individual should avoid occupations with hazardous machinery and concentrated exposure to fumes. This individual would be limited to simple,

routine, repetitive tasks and would need to work in a
well lit environment.

A.R. 107. The VE testified that such a hypothetical person could not perform any of Monroe's past work, either as Monroe actually performed it or as it is performed in the national economy. However, the VE testified that there were jobs that such a person could perform. The VE specifically identified the jobs of cashier, sales attendant, and cafeteria attendant.

When questioned by Monroe's attorney, the VE testified that if the hypothetical person the ALJ described "need[ed] to take a break approximately three to four times a day voluntarily and then is having also two to three times a day moments where he either falls asleep or . . . blacks out and . . . goes off task for . . . five to ten minutes at a time," he would not be able to sustain competitive employment and "that would be excessive breaks." A.R. 110.

### Medical Records

In light of the issues presented on appeal, we will limit our discussion of the medical records primarily to those relating to Monroe's episodes of fatigue and loss of consciousness and to Monroe's mental limitations.

Dr. Naik treated Monroe in early 2008. A January 2008 record from Dr. Naik noted that Monroe reported a "history of blacking out spells and headaches"; that Monroe "state[d] his

10

symptoms have been present . . . at least for 15 years including symptoms of excessive daytime sleepiness and sleep attacks and symptoms of cataplexy"; and that he had a "history of asthma for 20 years," a "history of seizure disorder," and a "[h]istory of obstructive sleep apnea disorder for 20 years." A.R. 550.[5] The record states, "The patient also gives symptoms of cataplexy where he has had mild generalized weakness as if he is going to fall, though he was conscious. These episodes occurred when he was excited or laughing, which is classic for cataplexy, but he never had fall." A.R. 551.

Dr. Naik's "impression" stated in part, "Symptoms of uncontrollable sleep and daytime confusional episodes and symptoms of cataplexy which goes with diagnosis of narcolepsy with cataplexy and symptoms of obstructive sleep apnea disorder." A.R. 552. The report indicated Dr. Naik would "send [Monroe] for diagnostic sleep study followed by MSLT testing[6]

---

[5] Dorland's Illustrated Medical Dictionary defines "cataplexy" as "a condition in which there are abrupt attacks of muscular weakness and hypotonia triggered by an emotional stimulus such as mirth, anger, fear, or surprise" and notes that "[i]t is often associated with narcolepsy." Dorland's, at 282.

[6] An MSLT is a full-day test consisting of five scheduled naps that tests for excessive daytime sleepiness related to narcolepsy or hypersomnia. See Sleep Education, Multiple Sleep Latency Test (MSLT) – Overview and Facts, http://www.sleepeducation.org/disease-detection/multiple-sleep-latency-test/overview-and-facts (saved as ECF opinion attachment).

where MSLT will be done if sleep study is negative for obstructive sleep apnea disorder. This is to rule out narcolepsy." A.R. 552 (footnote added). The report also noted, "His symptoms of cataplexy narcolepsy diagnosis [are] definite. The patient obviously is disabled to work and should not work until his problems are fixed because he ha[s] [a] high risk of getting hurt on the job or hurting somebody else and he also should not drive due to his symptoms [until] these symptoms are fully evaluated and taken care of." A.R. 552.

Monroe underwent a sleep study on February 7, 2008. Concerning the results, Dr. Naik observed, "Mildly reduced sleep efficiency with significantly decreased N3 stage,[7] mildly reduced REM sleep. Patient appears to have mainly central apneas during CPAP titration. However, these were corrected with high CPAP pressures." A.R. 611. Dr. Naik recommended "CPAP at 8cm of water by using heated humidification and by using full face mask." A.R. 611. He also stated, "If patient has symptoms of restless leg syndrome or periodic limb movement disorder,

_____

[7] "The two main types of sleep are rapid-eye-movement (REM) sleep and non-rapid-eye-movement (NREM) sleep." Healthy Sleep – Natural Patterns of Sleep, http://healthysleep.med.harvard.edu/healthy/science/what/sleep-patterns-rem-nrem (saved as ECF opinion attachment). "NREM sleep can be broken down into three distinct stages: N1, N2, and N3." Id. Stage N3 is "the deepest stage of NREM." Id.

12

treatment of that may improve sleep efficiency and sleep architecture." A.R. 611.

A treatment note from Dr. Naik from the day after the study indicated that Monroe continued to be sleepy and fatigued and that he had been turned down for government assistance paying for medications. The note reported that a pulmonary function test on January 21, 2008, produced normal results. Dr. Naik's impression was "[m]ild obstructive apnea disorder with excessive daytime sleepiness with symptoms of narcolepsy and cataplexy with excessive daytime sleepiness." A.R. 612. The record stated that Dr. Naik planned for Monroe to "repeat [the] sleep study" using a CPAP and undergo "MSLT testing to evaluate for continue[d] daytime sleepiness to see if the patient does have narcolepsy." A.R. 612. The report stated that after testing,

> [Monroe] might benefit from [an] agent like venlafaxine for cataplexy. He also would benefit from [an] agent like modafinil for excessive daytime sleepiness, but . . . he needs financial help. Note will be given to take to social services to assess for financial help of his medical treatment and further evaluation by doing repeat sleep study and MSLT testing. In meantime, [Monroe] is cautioned . . . not to drive long distance[s] and [to] stop driving when he is sleepy. . . . Neurological evaluation also will be helpful to make sure he does not have partial complex seizures causing passing out episodes.

A.R. 613.

Monroe underwent a second sleep study on April 1, 2008. Dr. Naik observed, "Good sleep efficiency with good sleep stages

13

with increased REM sleep stage" and "[n]o significant periodic limb movement disorder." A.R. 656.

The day after the second study, Monroe underwent MSLT testing using a CPAP machine. Dr. Naik's impression from the testing was "Abnormal multiple sleep latency testing with short sleep latency period and more than 2 SOREMPS. In view that the patient has symptoms of cataplexy, this strongly favors the diagnosis of narcolepsy with cataplexia. Patient has very good sleep efficiency and had poor control of his sleep apnea disorder based on preceding sleep study on CPAP." A.R. 657.

Several months later, on September 28, 2008, Monroe was admitted to the Southeastern Regional Medical Center for mental distress and medication management. A record from Dr. Audrea Marchant noted that Monroe was "very focused on having narcolepsy" and that he reported having "sleep attacks of at least 60 seconds in duration," which frequently occurred while he was driving. A.R. 674, 676. She also reported that Monroe was "focused on seizures" and "confusion." A.R. 674 (internal quotation marks omitted).

Based on his complaints, a neurologist, Dr. Indra Gatiwala, was brought in for a consultation. A report from Dr. Gatiwala stated that, considering Monroe's complaints, "[w]e will make sure that [Monroe] had completed the MSLT and sleep study to evaluate for narcolepsy, cataplexy, and obstructive sleep

14

apnea." A.R. 681. The report also recommended several tests, including an "EEG awake and asleep to rule out complex partial seizures." A.R. 681. Following the EEGs, the results of which Dr. Gatiwala described as "normal," A.R. 690, Dr. Gatiwala concluded that there was "no evidence for any seizure activity of any kind," A.R. 677. Apparently because he was unaware that Monroe had already undergone sleep studies and an MSLT earlier in the year, A.R. 679 ("He was sent for the MSLT and sleep study, but it was never completed."), Dr. Gatiwala "noted that the narcolepsy testing was incomplete," A.R. 677.

Monroe was discharged from Southeast Regional on October 1. Dr. Merchant's discharge summary noted,

> There was no time, whether the patient was working in one-to-one or was social on the unit, where he presented with any type of sleep attack, drop attack, or period of staring into space that would be consistent with absence seizures. He did at no time display any symptoms that would be consistent with complex partial seizures. When assured that he likely did not have seizures or narcolepsy, the patient began to complain of "significant difficulty breathing."

A.R. 677. But testing did not support that Monroe was having trouble breathing either. Dr. Merchant noted that she "informed [Monroe] that there was absolutely no functional impairment noted during this hospitalization and that would not support his request for disability." A.R. 678.

Related to his second DIB and SSI applications, Monroe underwent two consultative examinations in December 2010. A

15

December 11, 2010, report from Dr. Morton Meltzer indicated that Monroe had continued to complain of daily seizures and that he had reported that he could not return to one of his past jobs until he had been "cleared of the seizures for at least six months." A.R. 837. Dr. Meltzer stated that what Monroe "seems to describe is more narcolepsy [than seizures because] he just falls asleep." A.R. 837.

Shortly thereafter, Monroe underwent another consultative examination with a Dr. Ferriss Locklear. Monroe reported to Dr. Locklear that he had been diagnosed with sleep apnea and narcolepsy, that he uses a CPAP machine, and that he falls asleep easily if he is driving.

Regarding Monroe's mental limitations, two particular reports are relevant. Ashley L. Booth, M.A., Licensed Psychological Associate, and Henry William Link, Ph.D., Licensed Practicing Psychologist, conducted a consultative examination of Monroe on January 11, 2008, as a result of his initial DIB and SSI applications, and determined that Monroe "appeared marginally low in terms of reliably and safely mastering directions and procedures" and that his "ability to sustain attention, efforts, and constructive interpersonal relationships over time in goal-oriented activities was . . . moderately low." A.R. 558. In contrast, Dr. Meltzer opined after his consultative examination, conducted on December 11, 2010, that

16

Monroe was "able to understand, retain, and follow instructions" and able to "sustain attention to perform simple repetitive tasks." A.R. 839.

Additionally, state agency medical consultants determined in relation to Monroe's second DIB and SSI applications that Monroe was mentally limited in the following ways: (1) he was "[m]oderately limited" in his "ability to understand and remember detailed instructions" in that he could only "understand and carry out s/r/r tasks for [two-hour] periods during [a normal] workday," A.R. 144, 159; (2) he was "moderately limited" in his "ability to carry out detailed instructions" and in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" in that Monroe could "make simple work related decisions psych based s/s will intrude but rarely," A.R. 144-45, 159-60; he was "[m]oderately limited" in his "ability to interact appropriately with the general public" in that he could "accept supervision and interact [with] coworkers" but "would work best in enviro[n]ments that d[id] not require frequent interpersonal contacts," A.R. 145, 160; and he was "[m]oderately limited" in his "ability to respond appropriately to changes in the work

17

setting," although he could "adapt to simple change and avoid hazards," A.R. 145, 160-61.

## ALJ's Opinion

The ALJ issued his decision in early 2012 and determined that Monroe was not disabled during the relevant time period. The ALJ found that Monroe met his burden at step one to show he had not been working. At step two, he found that Monroe had the following severe, medically determinable impairments: sleep apnea, narcolepsy, myalgias, uveitis, anxiety, and mood disorder.[8] At step three, the ALJ determined that none of Monroe's impairments nor any combination thereof met or medically equaled any of the impairments in the Listing of Impairments.

The ALJ next determined that Monroe had the RFC to perform "light work,"[9] except that "he should climb stairs or ramps

---

[8] A claimant has a severe impairment if an impairment or combination of impairments significantly limits his physical or mental ability to perform basic work activities. See 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

[9] "Light work" is defined in the regulations as involving

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the

(Continued)

18

occasionally," "should never climb ropes or ladders," "is limited to occasional bending, balancing, stooping, crawling, kneeling, or crouching," "should avoid hazardous machinery and concentrated exposure to fumes," "is restricted to work in a well-lit environment," and "is limited to simple, routine, and repetitive tasks." A.R. 16. The ALJ recognized that this determination was in conflict with some of Monroe's testimony regarding his symptoms and resulting functional limitations. Although the ALJ found that Monroe's claimed symptoms could reasonably be expected to be caused by the impairments that the ALJ found, the ALJ nonetheless found that Monroe's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the" RFC that the ALJ had described. A.R. 17.

Most relevant to this appeal is the ALJ's analysis concerning the severe impairments of sleep apnea and narcolepsy. As to these impairments, the ALJ stated the following:

> The claimant has a history of respiratory problems. While these conditions may cause the claimant some discomfort, they do not preclude work. In January 2008, he complained of excessive daytime sleepiness. At that time, the claimant reported having a history of sleep apnea and narcolepsy. A pulmonary function

claimant] must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b), 416.967(b).

19

test, taken earlier that month, had yielded normal results. Upon examination, the claimant's respiratory system was also within normal limits. At that time, sleep testing showed evidence of moderate obstructive sleep apnea and periodic limb [movement] disorder. He was then diagnosed with mild obstructive apnea disorder with excessive daytime sleepiness with symptoms of narcolepsy. One month later, a sleep study indicated that the claimant had mildly reduced sleep efficiency with significantly decreased [N3] stage, mildly reduced REM sleep. The claimant's treating physician . . . then recommended treating the claimant's condition with a continuous positive airway pressure machine (CPAP) (Ex.18F). From that point forward, his conditions were controlled with conservative treatment. In September 2008, the claimant underwent electroencephalography [EEG], after complaining of confusion and narcolepsy. The study yielded normal results. Since then, the claimant has not reported any exacerbations of [his] condition. At a consultative examination in December 2010, he reported that he continued to use a CPAP machine. Upon examination, however, the claimant's respiratory system was normal. He was then diagnosed with a history of sleep apnea and narcolepsy. (Ex.33F). The claimant has not reported any exacerbations of his condition, since then. The undersigned considered the claimant's subjective complaints and the objective evidence in determining the residual functional capacity. As such, the undersigned finds that the claimant's resulting limitations are consistent with the residual functional capacity.

A.R. 17.

The ALJ also noted later in his opinion that Monroe had "alleged that he was unable to work because of . . . sleep apnea," but in fact that "condition is controlled." A.R. 19. The ALJ cited the fact that Dr. Naik "consistently described the claimant's sleep apnea as mild or moderate." A.R. 19.

20

As for the limitations resulting from Monroe's myalgias, eye problems, anxiety, and mood disorder, the ALJ found that they were "consistent with" with the RFC that the ALJ had described. A.R. 18, 19, 20.

The ALJ also addressed evidence in the record concerning Monroe's mental limitations. Regarding Mr. Booth and Dr. Link's January 2008 determination that Monroe "appeared marginally low, in terms of mastering basic directions or procedures reliably and safely" and that his "ability to sustain attention, efforts, and constructive interpersonal relationships over time in goal-oriented activities was moderately low," the ALJ stated simply that he gave it "limited weight" because "the objective evidence or the claimant's treatment history did not support" it. A.R. 19-20. On the other hand, the ALJ noted that Dr. Meltzer's subsequent December 2010 consultative examination, which produced the opinion that Monroe "was able to understand, retain and follow instructions" and "able to sustain attention to perform simple, repetitive tasks," was "supported by the objective evidence." A.R. 20. Accordingly, he gave it "some weight, to the extent that it [was] consistent with the" RFC that the ALJ had identified. A.R. 20. Finally, the ALJ considered the state agency medical consultants, whom he identified as having "opined that [Monroe] had mild limitations in activities of daily living and maintaining social

functioning" and "a moderate limitation in concentration, persistence, and pace." A.R. 20. The ALJ stated simply that the opinions were "supported by the objective evidence and the claimant's subjective complaints" and that the he gave them "significant weight." A.R. 20.

At step four, considering the RFC that the ALJ had identified, he determined that Monroe was unable to perform his past work. However, based on the testimony of the vocational expert, the ALJ determined that jobs did exist in the national economy for a person with Monroe's age, education, work experience, and RFC. He therefore determined that Monroe was not disabled, and he denied his application for benefits.

## II.

We review de novo a district court's decision on a motion for judgment on the pleadings. See Korotynska v. Metropolitan Life Ins. Co., 474 F.3d 101, 104 (4th Cir. 2006). A district court will affirm the SSA's disability determination "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." Bird v. Commission of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012).

Monroe argues that the ALJ committed several legal errors in analyzing the record before him.

A.

Monroe first argues that Judge Allen erred in not affording great weight to the findings Judge Leopold made regarding his severe impairments in the now-vacated 2010 decision. We disagree.

The fact that the Appeals Council vacated Judge Leopold's decision and remanded for a new decision is dispositive here. The SSA treats the doctrine of res judicata as applying when it has "made a previous determination or decision . . . on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action." 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1) (emphasis added); see Lively v. Secretary of Health and Human Servs., 820 F.2d 1391, 1392 (4th Cir. 1987) ("Congress has clearly provided by statute that res judicata prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final."). Here, Judge Leopold's decision, having been vacated, never became final, and thus the doctrine of res judicata did not apply.

Monroe maintains that our decisions in Lively and Albright v. Commissioner of the Social Security Administration, 174 F.3d 473 (4th Cir. 1999), and Social Security Acquiescence Ruling 00-1(4), 65 Fed. Reg. 1936-01 (Jan. 12, 2000), require a different

23

result. That is not the case, however. Interpreting <u>Albright</u> and <u>Lively</u>, Acquiescence Ruling 00-1(4) explained that "<u>where a final decision of SSA</u> after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period."[10] 65 Fed. Reg. at 1938 (emphasis added). Nothing in that rule, or in our circuit precedent, indicates that findings in prior non-final decisions are entitled to any weight. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481 ("The Appeals Council's decision, or the decision of the [ALJ] if the request for review is denied, is binding unless you or another party file an action in Federal district court, <u>or the decision is revised</u>." (emphasis added)). Accordingly, Judge Allen did not err in considering Monroe's applications de novo.

B.

Monroe next maintains that the ALJ erred in not determining his RFC using a function-by-function analysis. We agree.

---

[10] Monroe fails to come to terms with the finality requirement and simply omits the language pertaining to finality when he quotes the SSA's Acquiescence Ruling.

24

The process for assessing RFC is set out in Social Security Ruling 96-8p. See Mascio, 780 F.3d at 636. Under that ruling, the "'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." Id. (quoting SSR 96-8p, 61 Fed. Reg. at 34,475). Only after such a function-by-function analysis may an ALJ express RFC "'in terms of the exertional levels of work.'" Id. (quoting SSR 96-8p, 61 Fed. Reg. at 34,475). We have explained that expressing the RFC before analyzing the claimant's limitations function by function creates the danger that "'the adjudicator [will] overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do.'"[11] Id. at 636 (quoting SSR 96-8p, 61 Fed. Reg. at 34,476).

By expressing Monroe's RFC first and only then concluding that the limitations caused by Monroe's impairments were consistent with that RFC, the ALJ made this very error and thereby created the danger that the ruling identifies. The error is most concerning regarding Monroe's alleged episodes of

---

[11] Expressing a claimant's RFC in exertional terms without conducting a function-by-function analysis also could lead the adjudicator to "'find that the individual has limitations or restrictions that he or she does not actually have.'" Mascio, 780 F.3d at 636 (quoting SSR 96-8p, 61 Fed. Reg. at 34,476).

loss of consciousness and fatigue. Monroe testified that he would lose consciousness about two or three times per day and would need to take several breaks during the day because of fatigue. The ALJ indeed found that Monroe had the severe impairments of sleep apnea and narcolepsy, and he concluded that Monroe's impairments could reasonably be expected to cause his claimed symptoms. Nevertheless, he never made specific findings about whether Monroe's apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur. See SSR 96-8p, 61 Fed. Reg. at 34,478 ("In all cases in which symptoms, such as pain, are alleged, the RFC assessment must . . . [i]nclude a resolution of any inconsistencies in the evidence as a whole" and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work"). Rather, he simply concluded that Monroe was capable of light work (with the exceptions he identified) and that Monroe's claimed symptoms were "not credible to the extent they are inconsistent with" the RFC the ALJ identified.[12] A.R. 17; see also A.R. 19 (ALJ's finding that Monroe's "allegations are not fully credible").

---

[12] In Mascio, we criticized the use by the ALJ of similar language, noting that it got "things backwards by implying that ability to work is determined first and is then used to
(Continued)

We have not adopted a rule of per se reversal for errors in expressing the RFC before analyzing the claimant's limitation function by function. See Mascio, 780 F.3d at 636. However, we have held that "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (alterations and internal quotation marks omitted). We conclude that this is just such a case.

Because the ALJ never determined the extent to which Monroe actually experienced episodes of loss of consciousness and extreme fatigue, we cannot determine whether the hypothetical questions posed to the VE included all of Monroe's functional limitations, as they needed to do in order to be useful. See Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."

_____

determine the claimant's credibility." 780 F.3d at 639 (internal quotation marks omitted). On remand, the ALJ should assess Monroe's credibility in the context of the function-by-function analysis of the limitations caused by Monroe's impairments, which the ALJ will then use to determine Monroe's RFC.

27

(alteration and internal quotation marks omitted)). On remand, the ALJ will need to consider Monroe's narcolepsy and apnea, and all of his other physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect his ability to work. Only once the ALJ has conducted such an analysis will he be able to move on to steps four and five, concerning Monroe's ability to perform past work and his ability to perform other work that exists in significant numbers in the national economy. See Mascio, 780 F.3d at 636.

## C.

Independent from the aforementioned flaw in the ALJ's analysis, Monroe also contends that the ALJ did not satisfactorily explain his decision to partly discredit Monroe's testimony regarding the symptoms and functional limitations resulting from his impairments. Relatedly, Monroe maintains that the ALJ did not satisfactorily explain his decision to not rely on certain medical records that Monroe contends support his testimony.[13] We agree that the ALJ's opinion lacks the specific analysis that would allow for meaningful review.

Social Security Ruling 96-8p explains that the RFC "'assessment must include a narrative discussion describing how

---

[13] 20 C.F.R. §§ 404.1527(c) and 416.927(c) describe how medical opinions are to be weighed in determining entitlement to disability benefits.

the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Id. (quoting SSR 96-8p, 61 Fed. Reg. at 34,478; see also Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion"). We have held that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013).

1.

The ALJ cited evidence that he appeared to believe tended to discredit Monroe's testimony regarding his claimed episodes of loss of consciousness and fatigue. However, he failed to "build an accurate and logical bridge from the evidence to his conclusion" that Monroe's testimony was not credible. Clifford, 227 F.3d at 872. The facts the ALJ cited were as follows:

> The claimant has a history of respiratory problems. While these conditions may cause the claimant some discomfort, they do not preclude work. In January 2008, he complained of excessive daytime sleepiness. At that time, the claimant reported having a history of sleep apnea and narcolepsy. A pulmonary function test, taken earlier that month, had yielded normal results. Upon examination, the claimant's respiratory system was also within normal limits. At that time,

29

sleep testing showed evidence of moderate obstructive sleep apnea and periodic limb [movement] disorder. He was then diagnosed with mild obstructive apnea disorder with excessive daytime sleepiness with symptoms of narcolepsy. One month later, a sleep study indicated that the claimant had mildly reduced sleep efficiency with significantly decreased stage, mildly reduced REM sleep. The claimant's treating physician . . . then recommended treating the claimant's condition with a continuous positive airway pressure machine (CPAP) (Ex.18F). From that point forward, his conditions were controlled with conservative treatment. In September 2008, the claimant underwent electroencephalography [EEG], after complaining of confusion and narcolepsy. The study yielded normal results. Since then, the claimant has not reported any exacerbations of [his] condition. At a consultative examination in December 2010, he reported that he continued to use a CPAP machine. Upon examination, however, the claimant's respiratory system was normal. He was then diagnosed with a history of sleep apnea and narcolepsy. (Ex.33F). The claimant has not reported any exacerbations of his condition, since then. The undersigned considered the claimant's subjective complaints and the objective evidence in determining the residual functional capacity. As such, the undersigned finds that the claimant's resulting limitations are consistent with the residual functional capacity.

A.R. 17. The ALJ also noted Dr. Naik "consistently described the claimant's sleep apnea as mild or moderate." A.R. 19.

Simply put, the ALJ does not indicate how any of the facts he cited show that Monroe did not lose consciousness two or three times daily or suffer extreme fatigue. Although Monroe at times described his problems as blackouts and seizures, significant evidence in the record suggests that Monroe's symptoms were caused by narcolepsy, see, e.g., A.R. 657 (Dr. Naik's conclusion that the MSLT results "strongly favor[ed] the

30

diagnosis of narcolepsy with cataplexia"); A.R. 837 (Dr. Meltzer's conclusion that Monroe's explanation of his symptoms "seems to describe . . . more narcolepsy [than seizures because] he just falls asleep"), and the ALJ found that narcolepsy was a severe impairment of Monroe's. In citing "normal" results from pulmonary and respiratory tests and an EEG, the ALJ did not explain why he believed these results had any relevance to the question of what symptoms Monroe suffered from narcolepsy.[14] Nor does the ALJ explain why he believed that the intensity of Monroe's apnea had any relevance to that question.

As for the ALJ's statement that Monroe started using a CPAP machine and "[f]rom that point forward, his conditions were controlled with conservative treatment," A.R. 17, it is hard to know what the ALJ meant. To the extent that the ALJ meant that use of the CPAP was successful in reducing or eliminating his fatigue episodes of loss of consciousness, he does not cite any

---

[14] Dr. Naik, after all, was aware of all of the test results other than the EEG when he determined that the MSLT results "strongly favor[ed] the diagnosis of narcolepsy with cataplexia." A.R. 657. And the records seemed to indicate that Dr. Gatiwala ordered the EEG to rule out "complex partial seizures," as opposed to narcolepsy. See A.R. 681 (Dr. Gatiwala ordered EEGs "to rule out complex partial seizures"); see also A.R. 613 (report from Dr. Naik indicating that MSLT would test for narcolepsy and that neurological evaluation would help rule out partial complex seizures).

31

evidence for that conclusion.[15]  In fact, Monroe has consistently reported that use of the CPAP has <u>not</u> significantly helped those problems, and that was his testimony as well.  On remand, if the ALJ decides to discredit Monroe's testimony regarding his episodes of loss of consciousness and fatigue, it will be incumbent on him to provide a clearer explanation of his reasons for doing so, such that it will allow meaningful review of his decision.

2.

Another significant example of the ALJ's failure to "'include a narrative discussion describing how the evidence supports each conclusion'" <u>Mascio</u>, 780 F.3d at 636 (quoting SSR 96-8p, 61 Fed. Reg. at 34,478, concerns his explanation of the varying degrees of weight he gave to differing opinions concerning Monroe's conditions and limitations.  For example, regarding Monroe's mental impairments, the ALJ noted that Dr. Link and Mr. Booth's report concluded that Monroe "appeared marginally low, in terms of mastering basic directions or procedures reliably and safely" and that his "ability to sustain attention, efforts, and constructive interpersonal relationships over time in goal-oriented activities was moderately low."  A.R.

---

[15] Nor did the ALJ even mention that Monroe's testimony and Dr. Naik's medical records indicated that Dr. Naik wanted to treat Monroe with medication but that Monroe could not afford it.

19-20. The ALJ stated that he gave that opinion only "limited weight" based on a determination that "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings." A.R. 20. However, the ALJ did not specify what "objective evidence" or what aspects of Monroe's "treatment history" he was referring to. As such, the analysis is incomplete and precludes meaningful review. The ALJ gave similarly conclusory analysis of other opinions. See, e.g., A.R. 20 ("The undersigned gives the consultative examiner's findings some weight, to the extent that it is consistent with the residual functional capacity. The consultative examiner's opinion is supported by the objective evidence."); A.R. 20 ("The undersigned gives this opinion, some weight to the extent that it is consistent with the residual functional capacity. The objective evidence supports the consultative examiner's findings."); A.R. 20 ("The undersigned also gives this opinion some weight. The consultative examiner opinion is consistent with the objective evidence and other opinions of record, such as the first consultative physical examination."); A.R. 20 ("The undersigned gives the state agency findings limited weight. After reviewing the objective evidence, the undersigned finds that the claimant's limitations are more consistent with a light level of exertion."); A.R. 20 ("The undersigned gives the state agency consultants['] findings

33

significant weight.  The state agency findings are supported by the objective evidence and the claimant's subjective complaints.").  Without more specific explanation of the ALJ's reasons for the differing weights he assigned various medical opinions, neither we nor the district court can undertake meaningful substantial-evidence review.  See Radford, 734 F.3d at 295.

III.

For the foregoing reasons, we reverse the district court's judgment and remand with instructions to vacate the denial of Monroe's application for benefits and remand for further administrative proceedings.

REVERSED AND REMANDED WITH INSTRUCTIONS