**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1578**

RICKY E. BROWN,

                Plaintiff - Appellant,

      v.

COMMISSIONER SOCIAL SECURITY ADMINISTRATION,

                Defendant - Appellee.

Appeal from the United States District Court for the District Court of South Carolina, at Greenville. David C. Norton, District Judge. (6:14-cv-04486-DCN)

Argued: March 23, 2017                    Decided: September 29, 2017

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the majority opinion, in which Judge Wynn joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED**: Hannah Rogers Metcalfe, METCALFE & ATKINSON, LLC, Greenville, South Carolina, for Appellant. Melissa K. Curry, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, for Appellee. **ON BRIEF**: Timothy Clardy, DENNISON LAW FIRM, PC, Greenville, South Carolina, for Appellant. Nora Koch, Regional Chief Counsel, Taryn Jasner, Supervisory Attorney, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania; Beth Drake, Acting United States Attorney, Marshall Prince, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

KING, Circuit Judge:

Ricky E. Brown appeals from the judgment of the district court in South Carolina affirming the Commissioner of Social Security's denial of his claim for disability insurance benefits. In pursuing his appeal, Brown contends that the administrative law judge (the "ALJ") erred in various respects, including by improperly evaluating the medical opinion evidence and failing to heed the "treating physician rule." As explained below, we agree that the ALJ erred and therefore vacate the judgment of the district court and remand with instructions for that court to remand for further proceedings.

I.

Brown filed his claim for disability insurance benefits in August 2008, alleging that the onset of his disability occurred on July 19, 2006, when he was injured in a workplace accident and became unemployed. Brown asserts that he has not been able to work since the accident because of chronic pain and both physical and mental impairments. For Brown to qualify for disability insurance benefits, there must be a finding that he was disabled on or before his date last insured, June 30, 2011. Brown was forty-two years old at the time of his workplace accident and forty-seven years old on his date last insured. His primary source of income since the workplace accident has been workers' compensation benefits.

As for Brown's claim for disability insurance benefits, the Commissioner denied the claim initially in January 2009 and upon reconsideration in October 2009. In December 2009, Brown requested an ALJ hearing, which was conducted in August 2010.

2

Shortly after the hearing, in September 2010, the ALJ issued a decision denying the claim (the "First ALJ Decision"). Brown sought review of the First ALJ Decision by the Social Security Administration's Appeals Council. In May 2011, however, the Appeals Council denied Brown's request for review. Brown thereafter filed a complaint against the Commissioner in the District of South Carolina pursuant to 42 U.S.C. § 405(g), seeking judicial review of the First ALJ Decision. In July 2012, the district court reversed the First ALJ Decision and remanded for further proceedings. *See Brown v. Comm'r Soc. Sec. Admin.*, No. 6:11-cv-01500 (D.S.C. July 24, 2012), ECF No. 26.

Nearly a year later, in May 2013, the ALJ conducted another hearing. By a decision issued in February 2014, the ALJ again denied Brown's claim for disability insurance benefits (the "Second ALJ Decision"). Brown's subsequent request for Appeals Council review was denied in September 2014. At that time, the Second ALJ Decision became the final decision of the Commissioner.

In November 2014, Brown initiated this civil action against the Commissioner in the District of South Carolina, seeking judicial review of the Second ALJ Decision. In January 2016, the magistrate judge issued a report recommending that the Second ALJ Decision be affirmed. *See Brown v. Comm'r Soc. Sec. Admin.*, No. 6:14-cv-04486, ECF No. 21 (D.S.C. Jan. 29, 2016) (the "Report"). By an order of March 2016, the district court adopted the Report and affirmed the Second ALJ Decision. *See Brown v. Comm'r Soc. Sec. Admin.*, 6:14-cv-04486 (D.S.C. Mar. 30, 2016), ECF No. 26 (the "Order"). Brown has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g).

II.

Before delving into the particulars of this case, we identify some of the legal principles essential to the analysis. Specifically, we first outline the five-step process — established by the relevant regulations — that an ALJ is obliged to utilize in assessing a claim for disability insurance benefits. We then discuss the standards for evaluating medical opinion evidence, including the "treating physician rule" embodied in those regulations.

A.

The five-step process for assessing a claim for disability insurance benefits is spelled out in 20 C.F.R. § 404.1520(a)(4)(i)-(v). At steps one and two, the ALJ determines whether the claimant (1) is currently gainfully employed and (2) has a severe impairment, i.e., an impairment that significantly limits the claimant's physical or mental ability to perform basic work activities. The claimant bears the burden of proof with respect to those initial steps. If the claimant is employed or does not have a severe impairment, he is not disabled and the analysis ends. *See Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). When the analysis proceeds to step three, the ALJ decides whether the claimant has an impairment that meets or equals an impairment listed in the regulations for being severe enough to preclude a person from doing any gainful activity. The step three "burden remains on the claimant, and he can establish his disability if he shows that his impairments match a listed impairment." *Id.* (citations omitted).

If the claimant fails at step three, the ALJ must then determine the claimant's residual functional capacity ("RFC"), which has been defined as "the most you can still

4

do despite your [physical and mental] limitations." *See* 20 C.F.R. § 416.945(a)(1). In making the RFC determination, the ALJ must identify the claimant's "functional limitations or restrictions" and assess his "work-related abilities on a function-by-function basis, including the functions listed in the regulations." *See Monroe*, 826 F.3d at 179 (internal quotation marks omitted). The ALJ "must consider all of the claimant's medically determinable impairments of which the ALJ is aware, including those not labeled severe at step two." *Id.* (alterations and internal quotation marks omitted).

Additionally, the claimant is entitled to have the ALJ "consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *See* 20 C.F.R. § 404.1529(a); *see also Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017). Where "the medical signs or laboratory findings show that you have a medically determinable impairment [or impairments] that could reasonably be expected to produce your symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of your symptoms so that [the ALJ] can determine how your symptoms limit your capacity for work." *See* 20 C.F.R. § 404.1529(c)(1). In so doing, the ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects." *See Lewis*, 858 F.3d at 866 (citing, inter alia, 20 C.F.R. § 404.1529(c)(4) (providing, e.g., that the ALJ will consider whether there are "any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you")).

5

After determining the claimant's RFC, the ALJ proceeds to step four, "where the burden rests with the claimant to show that he is not able to perform his past work." *See Monroe*, 826 F.3d at 180. If the claimant succeeds at step four, the ALJ finishes at step five, where the burden shifts to the Commissioner. In order to withhold disability insurance benefits, the Commissioner must prove, "by a preponderance of the evidence, that the claimant can perform other work that exists in significant numbers in the national economy, considering the claimant's [RFC], age, education, and work experience." *Id.* (internal quotation marks omitted). If the Commissioner satisfies that burden, the claimant is not disabled and his claim for benefits must be denied.

B.

For claims — like Brown's — filed before March 27, 2017, the standards for evaluating medical opinion evidence are set forth in 20 C.F.R. § 404.1527. That regulation defines "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." *See* 20 C.F.R. § 404.1527(a)(1). For purposes of the regulation, an "acceptable medical source" includes a licensed physician or psychologist. *Id.* § 404.1502(a). The regulation provides that the ALJ "will evaluate every medical opinion" presented to him, "[r]egardless of its source." *Id.* § 404.1527(c). Generally, however, more weight is given "to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." *Id.* § 404.1527(c)(1).

6

Significantly, the regulation embodies a treating physician rule that accords the greatest weight — controlling weight — to the opinions of the claimant's "treating sources." *See* 20 C.F.R. § 404.1527(c)(2). The regulation defines a "treating source" as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." *Id.* § 404.1527(a)(2). The regulation explains:

> Generally, [the ALJ gives] more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.* § 404.1527(c)(2). The regulation promises that the ALJ "will always give good reasons in [his] decision for the weight [he gives] your treating source's medical opinion." *Id.*

Under the regulation's treating physician rule, controlling weight is to be accorded to "a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s)" if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *See* 20 C.F.R. § 404.1527(c)(2). When a treating source's medical opinion is not given controlling weight, five factors are utilized to determine what lesser weight should instead be accorded to the opinion. The first two of those factors are specific to treating sources:

7

- "Length of the treatment relationship and the frequency of examination," *see* 20 C.F.R. § 404.1527(c)(2)(i); and

- "Nature and extent of the treatment relationship," *id.* § 404.1527(c)(2)(ii).

The other three factors are used to determine the weight to be given to any medical opinion, whether from a treating or nontreating source:

- "Supportability" in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence — "particularly medical signs and laboratory findings" — substantiating it, *id.* § 404.1527(c)(3);

- "Consistency," meaning how consistent the "medical opinion is with the record as a whole," *id.* § 404.1527(c)(4); and

- "Specialization," favoring "the medical opinion of a specialist about medical issues related to his or her area of specialty," *id.* § 404.1527(c)(5).

Additionally, any other factors "which tend to support or contradict the medical opinion" are to be considered. *Id.* § 404.1527(c)(6).

The regulation identifies several issues that are reserved to the Commissioner, including whether a claimant's impairment matches a listed impairment, the claimant's RFC, and whether the claimant ultimately meets the statutory definition of disabled. *See* 20 C.F.R. § 404.1527(d). Thus, for example, when a medical source renders an opinion that a claimant is "'disabled' or 'unable to work,'" the ALJ will consider "all of the medical findings and other evidence that support" the medical source's opinion, but will not necessarily make a favorable disability determination. *Id.* § 404.1527(d)(1).

8

III.

A.

Here, as previously noted, the Commissioner's final decision is the Second ALJ Decision of February 2014 denying Brown's claim for disability insurance benefits.[1]  At steps one and two of the five-step process for assessing such a claim, the ALJ determined in Brown's favor that he had been unemployed since the alleged onset of his disability in July 2006 and had multiple severe impairments that significantly limited his ability — both physically and mentally — to perform basic work activities.  The ALJ identified Brown's severe impairments as the following:  degenerative joint disease of the hips and right shoulder; degenerative disc disease of the lumbar and cervical spine; depression; anxiety; dysthymic disorder (a chronic depressive mood disorder); and a somatoform disorder (one of a group of psychiatric disorders that cause unexplained physical symptoms, including pain).  At step three, however, the ALJ found that none of Brown's impairments matched an impairment listed in the regulations for being severe enough to preclude a person from doing any gainful activity.  The ALJ had specifically considered three listings:  major dysfunction of a joint; affective disorders; and somatoform disorders.

The ALJ proceeded to conduct an RFC assessment and found, inter alia, that Brown could lift or carry ten pounds, stand two of eight hours, walk two of eight hours,

---

[1] The Second ALJ Decision is found at A.R. 417-41.  (Citations herein to "A.R. __" refer to the contents of the Administrative Record.)

sit six of eight hours, and frequently handle, finger, and reach overhead. The ALJ also found that, because of Brown's mental impairments and possible side effects from his medications (including narcotic pain medications), he should have no more than occasional public contact and avoid moderate exposure to hazards. Additionally, to account for difficulties in maintaining concentration, persistence, and pace, the ALJ ruled that Brown "can only perform simple 1-2 step tasks." *See* Second ALJ Decision 7.

Significantly, the ALJ rejected evidence reflecting that Brown was not capable of performing any job because of his chronic pain and mental impairments. Under the evidence rejected by the ALJ, Brown could not maintain the concentration, persistence, and pace required for even unskilled sedentary work, and he would require too many daily rest breaks, as well as too many monthly sick days, to sustain full-time employment.

Premised on its RFC determination, the ALJ recognized at step four that Brown was unable to perform any past work as a millwright and maintenance worker. At step five, however, the ALJ concluded that Brown could perform certain unskilled sedentary work, such as work as a packer, assembler, inspector, or surveillance monitor. The ALJ then pronounced that Brown was not disabled "at any time from July 19, 2006, the alleged onset date, through June 30, 2011, the date last insured." *See* Second ALJ Decision 25. Brown's claim for disability insurance benefits was thereby denied.

B.

The evidence before the ALJ included a questionnaire completed by Brown in October 2008 in support of his claim for disability insurance benefits; Brown's testimony

10

at the first ALJ hearing in August 2010 and the second ALJ hearing in May 2013;[2] the parties' documentary medical opinion evidence; and the second ALJ hearing testimony of the Commissioner's medical expert and a vocational expert. We give the greatest attention herein to evidence relevant to the ALJ's RFC determination, particularly as it relates to the effect of Brown's physical pain on his ability to work.

1.

As Brown explained at the first ALJ hearing, he was a South Carolina resident in his forties who was divorced and lived alone. Although Brown's highest level of formal education was the eighth grade, he later passed a General Educational Development test and secured an associates degree in industrial mechanics. Until his July 19, 2006 workplace accident, Brown had worked steadily since his early teens. At the time of the accident, he was employed as a millwright by an entity called Consolidated Southern Industrial, installing heavy industrial machinery. While using a hammer drill on a concrete floor, the drill unexpectedly hit a hard object and jerked Brown sharply. Following the accident, Brown was bedridden for nine months at his mother's house. He then resumed living alone but continued to suffer from chronic pain in his back, left shoulder and arm, and right hip and leg; occasional pain in his left hip; and depression

---

[2] At the second ALJ hearing, the ALJ explained that he had "reviewed [Brown's] prior testimony" and, thus, there was no "need to go over anything that we've gone over in the past." *See* A.R. 452. The ALJ advised Brown, however, that if he wanted to present "anything new," he could do so. *Id.*

11

and anxiety. He had frequent muscle spasms in his right leg that awakened him when they occurred at night, and he had also developed arthritis in his hands.

Brown testified that — to relieve pain in the mornings while waiting for his pain medication to take effect — he normally alternated between sitting (about twenty minutes at a time), lying down (about twenty minutes at a time), standing (no more than ten to fifteen minutes at a time), and walking (about five to ten minutes at a time). While he might achieve some relief in parts of his body, he often aggravated the pain in others. Just about every afternoon, Brown would drive three-quarters of a mile to his mother's house, sit with her for ten to fifteen minutes, and then return home to lie down for thirty to forty minutes. Otherwise, he normally had to lie down ten to fifteen minutes every hour during the afternoons. He sometimes had to use a cane while walking.

Brown also testified during the first ALJ hearing that, at home, he would watch television, read, and watch birds. He had "a few coins" that he had "order[ed] from the U.S. Mint," and when he had "pocket change," he "might look at it with a magnifying glass." *See* A.R. 58. Brown could bathe himself, and he shaved and brushed his teeth, sometimes needing to sit on a stool to finish doing so. He had to rely on his sister to wash his dishes and clean his house, and on his nephew or a friend to mow his lawn. Two or three days a week, Brown had to ask his brother-in-law to feed his dog, which stayed outdoors. Other days, Brown would walk outside to feed his dog, and he would drive less than a mile to retrieve his mail from the post office and purchase crackers and a drink for lunch. He made instant coffee in the mornings, often fixed cereal or a microwave meal for dinner, and occasionally did laundry. He shopped for groceries

12

approximately twice a week, but only in smaller stores like Dollar General, because larger stores like Walmart were "just too big" for him to walk through. *See id.* at 56, 60. In addition to visiting his mother, Brown would sometimes visit his sister or cousin. He picked up a sandwich every couple of weeks at a Subway restaurant where his cousin's daughter worked, and he ate at a café once or twice a month. When Brown's then-ten-year-old daughter visited him, he would often take her and his great-niece to his brother's swimming pool, where his brother would watch the girls. Brown also sometimes took his daughter and great-niece to "the store," "the park," or "the lake." *See id.* at 54. Although Brown did not specify the distances travelled to those locations, he testified that he had trouble driving more than short distances and that he sometimes had to use his left foot to operate the accelerator and brake. Brown recounted driving fifty miles to see a doctor the previous week and thereby exacerbating the pain in his right leg. He also testified that his pain generally intensified with physical activity.

In the questionnaire he had completed nearly two years before the first ALJ hearing, Brown reported attending church three days a week for one to two hours at a time. He also shared that he practiced playing his guitars daily and performed gospel music in public on Friday nights, but only for thirty minutes at a time because of arm and shoulder pain and the arthritis in his hands. During the first ALJ hearing, Brown mentioned going to church the previous day, but did not say whether he was still regularly attending church three times a week. He testified, however, that he could "hardly play" his guitars anymore. *See* A.R. 61.

13

As of the second ALJ hearing, according to Brown, his pain had progressively worsened and his daily activities had thereby been further curtailed. He was suffering from frequent pain in his left shoulder, lower back, and right hip, and constant pain in his right shoulder, right leg, and right foot. The pain in Brown's right shoulder was a new development since the first ALJ hearing and was unrelated to his 2006 workplace accident. On a pain scale of one to ten — with ten being the highest — Brown rated the pain in his left shoulder, lower back, right leg, and right foot as a six to eight, and the pain in his right shoulder and right hip as a seven to eight. He was still sometimes awakened at night by muscle spasms in his right leg, which he rated a seven to nine. Because of his overall pain, Brown could sleep no more than four hours at a time. While awake, he continued to alternate between sitting, lying down, standing, and walking. Brown testified that he could sit comfortably in one position for about twenty minutes, stand in one position for twenty to twenty-five minutes, and walk for about ten minutes. He needed to lie down for about fifteen to twenty minutes every hour.

As before, Brown would heat up food in his microwave and sometimes do laundry. He still could not do housework like washing dishes and vacuuming; that was now done by a friend, rather than Brown's sister. Brown continued to take care of his own hygiene, but he now always had to sit on a stool to shave. About four times a week, he would drive to pick up his mail and something to eat. He no longer visited his mother and other family members, however, and he shopped for groceries for just thirty minutes once a week. Brown had stopped going to church about a year before the second ALJ hearing, because he could not "sit there in the service that long." *See* A.R. 481. Brown's

14

mother now brought his daughter to visit him every other weekend, and they would stay in Brown's home where the daughter played on a computer. Brown reported ongoing pain from arthritis in his hands that affected his grip and had caused him to quit playing his guitars altogether. Because of the pain in his fingers, Brown could use the computer just "a little with [a] mouse pad that you slide your hand on," and could not "use a regular mouse." *Id.* Brown still possessed his coin collection, but he explained that he had not "done anything [with his coins] lately. They're in a box." *Id.* at 482. He read a meditation book and the Bible for about twenty minutes a day, and he listened to music and watched television for about six hours a day.

During the second ALJ hearing, the ALJ asked Brown if he had exercised since his workplace accident, and Brown answered, "No, sir." *See* A.R. 485. The ALJ then asked, "Can you tell me why your doctors report that you have been exercising and you tell me you have not?" *Id.* Brown responded, "I just walk to the mailbox and back. That's exercise, I guess." *Id.* Pressed by the ALJ, Brown expounded: "I talked to [a doctor] about trying to walk on a treadmill, but I never really could do it. I tried it once, and I had to stay in a bed a couple of days from trying . . . . That's the only thing I can think of." *Id.* The ALJ then queried, "You were asked the question by [your lawyer] whether you do any home repairs or maintenance around your home. And you haven't done any since your onset date to the present time?" *Id.* Again, Brown answered, "No, sir." *Id.* The ALJ continued, "Can you tell me why your doctors report that you were doing work on your home, doing repairs?" *Id.* In response, Brown stated, "I don't know

15

what type of repairs you're referring to." *Id.* The ALJ then moved on from the topic of home repairs.

2.

Prior to the second ALJ hearing, Brown had submitted medical opinion evidence reflecting that his chronic pain stemmed not only from his physical impairments, but also from his somatoform disorder. At the outset of the second ALJ hearing, Brown's lawyer emphasized to the ALJ that "this is really [a] pain case." *See* A.R. 452. The lawyer specifically linked Brown's chronic pain to both his physical impairments and somatoform disorder, and noted that "it seems that everybody that has physically evaluated Mr. Brown has concurred that he would be limited, at the very least, with his concentration and persistence due to his pain." *Id.* Indeed, Brown's treating and examining sources consistently opined that Brown's chronic pain rendered him unable to work, and none of them questioned Brown's credibility with respect to the intensity and frequency of his pain.

Dr. David Tollison, Ph.D., a psychologist and clinical pain expert, had examined Brown in August 2010 and diagnosed his "Somatoform Disorder (pain disorder associated with both psychological factors and a general medical condition)," as well as "Major Depressive Disorder, superimposed on a chronic dysthymic disorder." *See* A.R. 377. Dr. Tollison administered two psychological tests and concluded that Brown's results were "valid with no suggestion of symptom embellishment." *Id.* Based upon those test results, as well as his evaluation of Brown and review of Brown's medical records, Dr. Tollison opined as follows:

16

Mr. Brown is expected to have difficulty maintaining concentration and attention over time, being distracted by his co-morbid symptoms of chronic pain and clinical depression. In addition, he is expected to require frequent and unscheduled rest periods. Given that pain intensity is increased with physical activity, it is unlikely he could meet typical production standards or regular work attendance. Work pressures, stresses, and demand situations are expected to result in deterioration both in physical and psychological functioning. His condition is chronic and expected to continue over the next twelve or more months. If awarded funds, Mr. Brown is capable of managing funds.

*Id.* at 378. Notably, the Commissioner's own consulting psychologist, Dr. Brian Keith, Ph.D., had previously diagnosed Brown with "Depression Versus Pain Disorder with Depression" after examining him in September 2009. *Id.* at 334. Consistent with Dr. Tollison, Dr. Keith recognized that Brown's "ongoing pain . . . may make it difficult for him to concentrate and engage in a sufficient pace throughout the course of a work day." *Id.* at 335.

The documentary medical opinion evidence also included the records of Dr. Michael Grier, an M.D. and pain management specialist who had first examined Brown in October 2006. By the second ALJ hearing, Brown had made more than forty office visits to Dr. Grier. Over the course of those visits, Dr. Grier repeatedly noted Brown's pain-inducing physical impairments, adjusted his pain medications, and recognized his pain-related limitations. In May 2013, Dr. Grier completed a form entitled "Clinical Assessment of Pain" opining that Brown's pain was "present to such an extent as to be distracting to adequate performance of daily activities or work." *See* A.R. 621. Dr. Grier also stated that, with increased physical activity, "[g]reatly increased pain is likely to occur, and to such a degree as to cause distraction from the task or even total

17

abandonment of the task." *Id.* According to Dr. Grier, Brown's pain would cause moderate to moderately severe interference with his ability to concentrate during an eight-hour work day; would interfere with his ability to stay on task for two consecutive hours without taking an unscheduled break; would cause him to exceed the number of daily breaks normally allowed; and could possibly cause him to have more than three pain-related absences from work each month.

Dr. Stephen Worsham, another M.D. and a primary care physician, had seen Brown on nearly twenty occasions from 2007 to 2012. In February 2011, Dr. Worsham completed a form reflecting his view that Brown suffered "from a medical condition or combination thereof that would, most probably, cause him to experience chronic pain"; that the pain was so severe that it would distract Brown in the workplace and impair his ability to work; and that the pain was likely to increase with physical activity. *See* A.R. 240. Shortly thereafter, in April 2011, pain management specialist Dr. Carol Burnette, M.D., examined Brown to assess his eligibility for workers' compensation benefits and concluded that Brown's "ongoing pain and requirements for narcotic pain medications" left him unable "to maintain gainful employment in any capacity." *Id.* at 613.[3]

---

[3] Karl Weldon, the vocational expert who testified at the second ALJ hearing, confirmed that there would be no work available to Brown if he had to lie down for twenty minutes every hour of an eight-hour work day, if he exceeded the number of allotted breaks per day, or if he missed two or more days of work a month.

18

3.

Brown's treating and examining sources were contradicted by the Commissioner's medical expert, Dr. Alfred Jonas, M.D., a Florida psychiatrist who testified at the second ALJ hearing by telephone. Dr. Jonas had not treated, or even examined, Brown. Rather, Dr. Jonas simply reviewed the administrative record, not including Brown's testimony at the first ALJ hearing. Addressing Brown's physical impairments, Dr. Jonas specifically — and just briefly — discussed only a few of Brown's medical records. One of those was a record of Dr. Marion McMillan, an M.D. and pain management specialist who had examined Brown in July 2007 and recommended surgery. Therein, Dr. McMillan stated that "MRI examination documents far right lateral disc herniation and foraminal compression of nerve root at L4-5, anatomically appropriate to explain symptoms." *Id.* at 244. Dr. Jonas did not name Dr. McMillan but acknowledged his opinion that "there was an MRI that was consistent with the symptoms." *Id.* at 467. Dr. Jonas also noted a report in the record of an August 2006 MRI of Brown's lumbar spine. Without elaboration, Dr. Jonas testified that it was "not clear to me from the MRI report that the findings would have been consistent with the symptoms." *Id.* Otherwise, Dr. Jonas mentioned an October 2008 record of Dr. Burnette, which reflected that an "EMG of selected muscles of the right lower extremity and lumbar paraspinal muscles . . . show normal findings." *See id.* at 260. Dr. Jonas also cited records of Dr. Grier of February, April, May, and September 2008 documenting physical examinations, which Dr. Jonas characterized as reporting nothing more than "a little bit of a limp." *Id.* at 468.

From there, Dr. Jonas testified that "[t]he record doesn't really seem to provide the kinds of objection [sic] indicators that we would expect so that we can assume that the pain is as severe as the complaint is." *See* A.R. 469. Dr. Jonas concluded:

> So what I'm going to tell you about this is that there was an injury. I'm not sure that it was very serious, and it looks to me as if the complaint of pain has been amplified, and I cannot tell you with any confidence that there are meaningful restrictions or limitations that would apply.

*Id.* That was the full extent of Dr. Jonas's testimony concerning Brown's physical impairments and the veracity of his complaint of pain.

With respect to Brown's mental impairments, Dr. Jonas testified that there was no "firm diagnosis" in the record, in that Brown's "amplified" complaint of pain meant that his psychiatric diagnoses were "amplified, as well." *See* A.R. 469-70. Dr. Jonas explained that, because there was no "firm psychiatric diagnosis that I could confirm for you, . . . I didn't make a careful attempt to analyze" whether Brown had any "meaningful functional impairments" resulting from his mental condition. *Id.* at 470. Nevertheless, pointing to snippets from Dr. Tollison's and Dr. Keith's evaluations, Dr. Jonas went on to opine that "the indicators are suggestive of not a substantial concentration, persistence and pace impairment, but there could be a slight [or mild] impairment." *Id.* at 471 (observing that Brown could only "repeat five numbers forward" and "remember one of three test words" with Dr. Keith, but that Dr. Keith stated Brown's "cognitive functioning was average" and Dr. Tollison noted Brown's "[c]ognitive functioning [was] intact"). When then asked by Brown's lawyer about somatoform disorders, Dr. Jonas testified that there could be no such disorder in Brown. *See id.* at 472 ("So we would not really think

20

in terms of a somatoform disorder in somebody that we already thought might have a cause of pain just because the person seems to be amplifying the complaint. . . . I think that would be a misunderstanding of what somatoform is about.").

After Dr. Jonas hung up, Brown's lawyer objected that — although Dr. Jonas could testify as an expert in psychiatry — there was nothing in the record reflecting that he had "any medical expertise in the pain response to physical impairments." *See* A.R. 473. The ALJ overruled the objection, explaining that Dr. Jonas was "a physician" and "did go to medical school," and that he had "the capability of giving information, opinions, with respect to diagnostic tests and physical examinations from his medical training and from his practice." *Id.* The ALJ also faulted the lawyer for failing to object when "we could have asked [Dr. Jonas] what his capabilities are." *Id.*

C.

As previously noted, the ALJ found that Brown suffered from an array of severe physical and mental impairments, i.e., degenerative joint disease of the hips and right shoulder, degenerative disc disease of the lumbar and cervical spine, depression, anxiety, dysthymic disorder, and a somatoform disorder. In assessing Brown's physical pain as part of the RFC determination, the ALJ found in Brown's favor that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms." *See* Second ALJ Decision 9. Against Brown, however, the ALJ further found that Brown's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* The ALJ's reasons for that adverse credibility finding can be summarized as follows: (1) that Brown's statements about the limiting

21

effects of his pain were inconsistent with his testimony about his activities of daily living; (2) that Brown's statements were also in conflict with other evidence; and (3) that the objective medical evidence did not reasonably support the claimed intensity and frequency of Brown's pain.

1.

With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." *See* Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities — or any of the activities depicted by Brown — showed that he could persist through an eight-hour workday.

2.

Turning to his second reason for the adverse credibility finding, the ALJ pointed to various pieces of evidence that he deemed to be in conflict with Brown's claim of disabling pain. For example, the ALJ invoked medical records establishing — in the ALJ's words — that Brown "has been exercising" and "doing a lot of physical activity associated with work around his house and some malfunction of his vehicle." *See*

22

Second ALJ Decision 10-11. The medical records cited (but not quoted) by the ALJ included the following:

- An August 2007 record of primary care physician Dr. Worsham: "[Brown] states that he had crawled up under a truck to work on a starter and has strained his shoulder, hip, and back in doing so," *see* A.R. 296;

- A September 2009 record of pain management specialist Dr. Grier: "[Brown] has been walking more, but sometimes that exacerbates his pain," *id.* at 369;

- A December 2009 record of Dr. Grier: "[Brown] has had a bad week this week. He has had a lot of physical activity associated with work around the house and some malfunction of his vehicle. He is here for follow-up and treatment options," *id.* at 368;

- A May 2010 record of Dr. Grier: "[Brown] is having some increasing pain because he decided to start a walking regimen, which he has done for the past 7 days. He has some increasing pain in his left knee and hip because of known degenerative disease there," *id.* at 365;

- An April 2012 record of Dr. Grier: "Stable on meds for back pain with a recent exacerbation three weeks ago due to some work at home," *id.* at 604; and

- An October 2012 record of Dr. Grier: "[Brown] has been exercising, trying to deal with the carrier's request to decrease his medications and he has flared up some musculoskeletal pain in the supraspinatus muscle," *id.* at 597; *see also id.* at 592, 594 (records of December 2012 and February 2013 containing same notation).

According to the ALJ, those medical records somehow reflected that Brown's pain was not as limiting as he claimed and contradicted his answers to the ALJ's questions about exercise and home repairs during the second ALJ hearing.

The ALJ further reasoned that, at the second ALJ hearing, Brown rated his lower back pain a six to eight out of ten on the pain scale, which was "not consistent with

23

reports of marked improvement in his back pain ever since receiving facet joint injections." *See* Second ALJ Decision 10. Medical records cited by the ALJ indeed reported "marked improvement" in Brown's back pain following injections. *See, e.g.*, A.R. 600 (August 2012 record of Dr. Grier noting "marked improvement in [Brown's] back pain since the injections [in July 2012]. He decided to stop all his narcotics and has had none for 10-14 days"). The ALJ failed to acknowledge, however, that contemporaneous records also indicated that the injections provided only temporary relief. *See id.* at 599 (September 2012 record of Dr. Grier's associate, Dr. Burnette, reporting that, "[u]nfortunately, [Brown's] back pain has worsened since his last visit and he does not feel able to continue going without the pain medication"). Additionally, the ALJ did not explain how a rating of six to eight on the pain scale — a scale going up to ten — was incompatible with "marked improvement" in Brown's back pain.

As another example of the ALJ's justification for the adverse credibility finding, the ALJ faulted Brown for complaining of left shoulder pain during the first ALJ hearing, without "mak[ing] any allegations with respect to his left shoulder at the second hearing" or "consistent complaints of left shoulder pain in the record." *See* Second ALJ Decision 10. The ALJ thereby ignored Brown's second ALJ hearing testimony about ongoing left shoulder pain and records documenting that complaint. *See, e.g.*, A.R. 474 (Brown's second ALJ hearing testimony that he continued to suffer from pain in his "left shoulder," and that the pain occurred "[d]uring the night, five days out of the week"); *id.* at 611-12 (notations in Dr. Burnette's April 2011 workers' compensation evaluation that, "[o]ver time, [Brown] has noticed increased pain in the . . . left shoulder," and that his "problems

24

with the left shoulder and hand" have caused "difficulty trying to play guitar or other instruments"); *id.* at 185 (notation in August 2010 vocational evaluation that Brown "suffers from left shoulder pain," i.e., "a sharp ache that increases with activities").

The ALJ's adverse credibility finding also relied on an exchange during the second ALJ hearing between Brown and the Commissioner's medical expert, Dr. Jonas. The exchange began with Dr. Jonas's testimony that, "back in July of 2007, . . . somebody recommended surgery for [Brown], and I don't know if he ever had the surgery." *See* A.R. 467. Having been authorized by the ALJ to question Brown, Dr. Jonas then asked him, "[D]id you have surgery?" *Id.* Brown responded simply, "No, sir." *Id.* Thereafter, Dr. Jonas did not opine on the import of Brown's response, but the ALJ viewed it as proof that Brown's "alleged disabling pain is not as severe as he alleges." *See* Second ALJ Decision 11. In so concluding, the ALJ failed to acknowledge or address Brown's first ALJ hearing testimony that he opted not to have the surgery — which had been recommended by Dr. McMillan — on the advice of Dr. Grier. Specifically, Brown explained during the first ALJ hearing that Dr. Grier advised him the "laser type surgery . . . would burn the disc and bone, and it would make me worser than better, so . . . he suggested that I shouldn't have that done." *See* A.R. 44.

At times, the ALJ relied on his own observations and medical judgments in finding that Brown's pain was not as limiting as he claimed. For example, the ALJ concluded that, "[i]nconsistent with the claimant's testimony regarding sitting tolerance of 20 minutes[,] Mr. Brown sat in the [second ALJ] hearing from 9:48 until 10:59[,] standing on one occasion for less than a minute. In addition, the hearing continued from

25

11:58 until 12:02 with the claimant sitting." *See* Second ALJ Decision 13. From his observations of Brown, the ALJ reckoned that Brown sat through "both [the seventy-one- and four-minute] sessions without discomfort." *See id.* Additionally, the ALJ determined that Brown's ability to complete one of the psychological tests administered by Dr. Tollison, the MMPI-II, established that Brown had no more than mild difficulties in maintaining concentration, persistence, and pace. That is, the ALJ relied on his own judgment that, "[c]ertainly, taking the MMPI-II at one sitting requires a fair amount of concentration and persistence especially when obtaining a valid score when one has to distinguish questions that are similar and ability to discern the subtle distinctions in the questions asked." *See id.* at 20. The ALJ emphasized that "Dr. Tollison reported the claimant's test results were valid," *see id.*, but disregarded Dr. Tollison's complete statement that the results were "valid *with no suggestion of symptom embellishment*," *see* A.R. 377 (emphasis added). The ALJ also criticized Dr. Tollison for concluding both "that Mr. Brown had marked limitations in concentration[,] persistence or pace," and that he "was capable of managing his funds" — a criticism that apparently was premised on the ALJ's view that Brown's ability to manage his money equated with the ability to sustain a full-time job. *See* Second ALJ Decision 18.

3.

For the third reason for the adverse credibility finding — that the objective medical evidence did not reasonably support the claimed intensity and frequency of Brown's pain — the ALJ credited the opinion of the Commissioner's nontreating and nonexamining expert Dr. Jonas over the opinions of Brown's treating and examining

26

sources. In so doing, the ALJ acknowledged that Dr. Jonas was a specialist in psychiatry, and was "not a specialist in orthopedics." *See* Second ALJ Decision 19. The ALJ nonetheless credited Dr. Jonas's opinion because "Dr. Jonas reviewed all of the evidence of record" and thereby "had the big picture of the longitudinal medical and mental evidence." *See id.* at 17.

With respect to Brown's physical impairments, the ALJ invoked Dr. Jonas's conclusion that the August 2006 MRI of Brown's lumbar spine "was not consistent with the claim[ed] symptomology" — without mentioning pain management specialist Dr. McMillan and his contrary MRI assessment. *See* Second ALJ Decision 19. The ALJ also pointed to Dr. Jonas's observations that the October 2008 EMG of selected muscles in Brown's right lower extremity "was normal" and that between February and September 2008 Brown had just a "modest" limp. *See id.* Although Dr. Jonas's testimony was limited to those few medical records, the ALJ explained that he was persuaded by Dr. Jonas's opinion because Dr. Jonas "articulated specific evidence, diagnostic test[s] and physical examinations to support his conclusions." *See id.*

The ALJ again relied on Dr. Jonas in finding that Brown's mental impairments did not leave him unable to persist through an eight-hour workday. According to the ALJ, he accepted Dr. Jonas's opinion that Brown had only "mild restrictions" in concentration, persistence, and pace as a result of his mental impairments, because "Dr. Jonas articulated a rationale and specific evidence over the longitudinal history including the [August 2010] testing by Dr. Tollison in support of his conclusions." *See* Second ALJ Decision 17. Of course, in rendering his opinion, Dr. Jonas simply noted that Brown

27

could only "repeat five numbers forward" and "remember one of three test words" during his September 2009 evaluation by Dr. Keith, but that Brown's cognitive functioning was deemed "average" by Dr. Keith and "intact" by Dr. Tollison. *See* A.R. 471.

Remarkably, the ALJ did not address the incongruity between his finding that Brown suffered from a severe somatoform disorder and Dr. Jonas's rejection of that diagnosis. Indeed, the ALJ did not even mention the somatoform disorder in connection with his assessment of Brown's claim of disabling pain.

Meanwhile, the ALJ rejected the consistent opinions of Brown's treating and examining sources — Dr. Tollison, Dr. Keith, Dr. Grier, Dr. Worsham, and Dr. Burnette — that Brown lacked the concentration, persistence, and pace for full-time work and would need more than a permissible number of rest breaks and sick days. The ALJ specified that the opinions of Drs. Tollison, Grier, and Worsham were contrary and inferior to the opinion of Dr. Jonas. *See, e.g.*, Second ALJ Decision 17 ("Dr. Jonas reviewed all of the evidence of record which Dr. Tollison did not."); *id.* at 20 ("[B]ased on the testimony of Dr. Jonas, . . . I find that substantial evidence is inconsistent with Dr. Grier's opinion."). Furthermore, the ALJ faulted the opinions of Drs. Tollison, Grier, Worsham, and Burnette for being at odds with the ALJ's view of the record, including medical records and Brown's activities of daily living. *See, e.g.*, *id.* at 19 ("I find [Dr. Worsham's] opinion unsupported by [his] physical examinations and inconsistent with [Brown's report to Dr. Worsham of] working on a car . . . ."); *id.* at 20 ("Dr. Grier's opinions concerning the ability to attend and concentrate on task is not consistent with

28

Mr. Brown's . . . ability to handle the rigors of answering 567 or 338 questions on the short version of the MMPI-II.").

The ALJ also found fault with the forms used to convey the opinions of Drs. Grier and Worsham, and refused to accord controlling weight to those physicians as treating sources. *See* Second ALJ Decision 18-20. The ALJ accorded "limited weight" to Dr. Tollison, "less than significant weight" to Dr. Grier, and "little weight" to Drs. Worsham and Burnette. *Id.* at 17, 19-21. Despite the credit he accorded Dr. Jonas, the ALJ devalued Dr. Worsham, a primary care physician, for not being "a specialist," and Dr. Keith, a psychologist, because he merely "evaluated [Brown] on one occasion and his evaluation [was] only a snapshot in time." *Id.* at 18, 22. The ALJ ultimately gave "limited weight" to Dr. Keith's opinion to the extent it was "inconsistent with Dr. Jonas," but identified Dr. Keith's opinion as "the initial predicate in limiting [Brown] to simple [1-2] step tasks because of pain." *Id.* at 22.

### D.

In November 2014, following the denial of Brown's claim for disability insurance benefits, Brown sought review of the Second ALJ Decision in the district court. Brown contended, inter alia, that the ALJ improperly evaluated the medical opinion evidence and failed to heed the treating physician rule in rejecting the proposition that Brown's pain- and depression-related limitations in maintaining concentration, persistence, and pace and his need for more than a permissible number of rest breaks and sick days left him unable to sustain full-time employment. More specifically, Brown asserted that the ALJ erred in his RFC determination by crediting the opinion of nontreating and

29

nonexamining source Dr. Jonas over the opinions of Brown's treating and examining sources — including not only Drs. Tollison, Keith, Grier, Worsham, and Burnette, but also Dr. McMillan, who went unmentioned in the Second ALJ Decision. As Brown argued in his objections to the January 2016 Report of the magistrate judge recommending affirmance of the Second ALJ Decision, a significant part of the ALJ's misapplication of the treating physician rule was his reliance on cherry-picked evidence skewed to contradict Brown's doctors. Brown explained:

> While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, the ALJ must consider all the record evidence and cannot pick and choose only the evidence that supports his position. Nonetheless, that is exactly what the ALJ has done in [the Second ALJ Decision]. The ALJ has disregarded ALL the medical evidence — evidence which remains consistent across all physicians who have ever examined [Brown] — in exchange for selected evidence which supports [the ALJ's] position.

*See Brown v. Colvin*, No. 6:14-cv-04486, at 9 (D.S.C. Feb. 17, 2016), ECF No. 23 (internal quotation marks omitted). Nevertheless, by its Order of March 2016, the district court adopted the Report and affirmed the Second ALJ Decision, thereby prompting this appeal.[4]

---

[4] The Commissioner contends on appeal that Brown failed to preserve certain arguments by raising them in the district court, including in his objections to the magistrate judge's Report. *See United States v. Midgette*, 478 F.3d 616, 621-22 (4th Cir. 2007) (citing 28 U.S.C. § 636(b)(1)). To the extent that the Commissioner targets any of the issues on which we premise our vacatur and remand, we disagree that those issues were waived.

IV.

We are called upon today to review the district court's affirmance of the Second ALJ Decision. In social security proceedings, a court of appeals applies the same standard of review as does the district court. *See Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985). That is, a reviewing court must "uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (internal quotation marks omitted).

On appeal, Brown reiterates the contentions that he made in the district court, including that the ALJ improperly assessed the medical opinion evidence and disregarded the treating physician rule in rendering his RFC determination and finding that Brown could persist through an eight-hour workday. In the words of Brown, the ALJ's analysis "effectively turned the [treating physician rule] on its head, deferring to [a physician] who had never laid eyes on Brown while dismissing the opinions of those who had examined and treated him dozens of times over many years." *See* Br. of Appellant 27. As heretofore announced, we agree and therefore vacate and remand for further proceedings.

A.

Under the regulation spelling out the standards for evaluating medical opinion evidence, more weight is generally given "to the medical opinion of a source who has

31

examined you than to the medical opinion of a medical source who has not examined you." 20 C.F.R. § 404.1527(c)(1). The regulation's treating physician rule accords the greatest weight — controlling weight — to the opinions of treating sources, because those "sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Id.* § 404.1527(c)(2). Nevertheless, the ALJ credited the opinion of nonexamining and nontreating source Dr. Jonas that the objective medical evidence did not reasonably support the intensity and frequency of physical pain claimed by Brown. The ALJ also credited Dr. Jonas's opinion that Brown had only mild restrictions in concentration, persistence, and pace as a result of any mental impairments. Faithless to the regulation and its treating physician rule, the ALJ relied on a theory that — because Dr. Jonas had simply reviewed the administrative record — he had greater knowledge of "the longitudinal medical and mental evidence" than all of Brown's treating and examining sources. *See* Second ALJ Decision 17.

In addition to flouting the treating physician rule, the ALJ's reliance on Dr. Jonas was not justified by the three factors that might actually warrant crediting the opinion of a nontreating source: supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion. *See* 20 C.F.R. § 404.1527(c)(3)-(5). With respect to the supportability of Dr. Jonas's opinion, he cited just a few medical

records and two diagnostic tests — dating from 2006 to 2008 and largely focused on Brown's lower back — before summarily opining that there were no objective physical indicators for the ongoing and worsening pain that Brown claimed as late as 2013 in his shoulders, lower back, and right hip, leg, and foot. Dr. Jonas also opined that Brown's physical impairments resulted in no meaningful restrictions or limitations. After then acknowledging that he had not carefully analyzed whether there were any limitations arising from Brown's mental impairments, Dr. Jonas made the off-the-cuff pronouncement that Brown had, at most, a mild impairment in concentration, persistence, and pace. Dr. Jonas based that judgment on selected nuggets from the 2009 and 2010 evaluations of Brown by Drs. Keith and Tollison, each of whom had ultimately concluded — premised on far more evidence than that discussed by Dr. Jonas — that Brown could not persist through an eight-hour workday because of his chronic pain and depression.

As for the consistency between Dr. Jonas's opinion and the record as a whole, his opinion was not even consistent with the ALJ's findings that Brown suffered from severe physical impairments in his right shoulder, lower back, and hips that limited him to sedentary work, as well as severe mental impairments that included depression, anxiety, dysthymic disorder, and a somatoform disorder. Indeed, not only was Dr. Jonas unable to make a firm diagnosis of Brown's mental impairments, but Dr. Jonas rejected the diagnosis of a somatoform disorder that the ALJ accepted. Thus, where Dr. Jonas's specialization — psychiatry — might have justified the elevation of his opinion, the ALJ had a significant disagreement with Dr. Jonas. Meanwhile, despite Dr. Jonas's lack of

33

specialization in orthopedics — and despite devaluing the opinion of primary care physician Dr. Worsham for his similar lack of specialization — the ALJ credited Dr. Jonas's conclusion that there were no objective physical indicators for the claimed intensity and frequency of Brown's pain.

## B.

The only possible justification left for the ALJ's crediting of Dr. Jonas over Brown's treating and examining sources is that Dr. Jonas's opinion lined up most closely with the view of the record espoused by the ALJ in rendering his adverse credibility finding against Brown.[5]  Of course, the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion.  *See* 20 C.F.R. § 404.1527(c)(2) (requiring controlling weight to be accorded to a treating source's opinion if, inter alia, it "is not inconsistent with the other substantial evidence in your case record"); *id.* § 404.1527(c)(4) (specifying "[c]onsistency . . . with the record as a whole" as a factor to be used to determine the weight to be given any other medical opinion, whether from a treating source not accorded controlling weight or from a nontreating source).  Similarly, in assessing the credibility of a claimant's statements about pain and its functional effects, the ALJ is supposed to consider whether there are "any conflicts between your statements and the

_____

[5] To the extent that the ALJ found fault with the forms reflecting the opinions of Drs. Grier and Worsham, that was not a sufficient reason to favor the contrary opinion of Dr. Jonas.  *See, e.g.*, *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (rejecting Commissioner's challenge to a physician's use of a form, where there was "a long record of treatment by [the doctor] that support[ed] his notations on the form").

34

rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you." *Id.* § 404.1529(c)(4).

Significantly, however, the ALJ must "'build an accurate and logical bridge from the evidence to his conclusion' that [the claimant's] testimony was not credible" — which the ALJ wholly failed to do here. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). For example, in support of the adverse credibility finding, the ALJ declared that Brown's statements about the limiting effects of his pain were inconsistent with his testimony about his activities of daily living. The ALJ noted various of Brown's activities — such as "cooking, driving, doing laundry, collecting coins, attending church and shopping" — but did not acknowledge the limited extent of those activities as described by Brown or explain how those activities showed that he could sustain a full-time job. *See* Second ALJ Decision 11. Similarly, in *Clifford*, "the ALJ merely list[ed] [the claimant's] daily activities as substantial evidence that she does not suffer disabling pain." *See* 227 F.3d at 872. As explained by the *Clifford* court, the ALJ's effort was "insufficient," because the claimant testified to only "minimal daily activities" that neither established that she was "capable of engaging in substantial physical activity" nor "contradict[ed] her claim of disabling pain." *Id.* (recounting claimant's testimony that, e.g., "her typical household chores took her only about two hours to complete"; "she cooks, but only simple meals"; "she could vacuum, but it hurts her back"; "she goes grocery shopping about three times a month and 'sometimes' carries groceries from the car to the apartment"; and "she

35

walked to get exercise at her doctor's suggestion," but "must rest after walking anywhere between three and five blocks").

There is also no "accurate and logical bridge" from the evidence to the ALJ's conclusion that Brown's statements about his pain were in conflict with other evidence, including medical records that the ALJ characterized as showing that Brown had "been exercising" and "doing a lot of physical activity associated with work around his house and some malfunction of his vehicle." *See* Second ALJ Decision 10-11. The medical records cited (but not quoted) by the ALJ actually reflected that, since August 2007, Brown had made a couple of attempts at walking more and some effort at exercising, engaged in housework on two occasions, and worked on his vehicle twice — thereby aggravating his physical impairments and pain each and every time. The records do not support the ALJ's suggestion that Brown was regularly exercising and doing housework and car repairs, in contradiction to his claim of disabling pain. *See, e.g.*, *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (concluding that an ALJ improperly "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). Moreover, other than the isolated incidents of car repairs, the records very well may refer only to activities that Brown himself testified to, including walking and housework such as doing laundry.

Contrary to the ALJ, the records also do not contradict Brown's second ALJ hearing testimony. After Brown generally denied that he had "exercised" or engaged in "home repairs or maintenance" since his workplace accident, the ALJ asked "why your

36

doctors report that you have been exercising." *See* A.R. 485. Brown responded that the doctors might be referring to his regular walks "to the mailbox and back," or perhaps to an unsuccessful endeavor "to walk on a treadmill." *Id.* (surmising that walking is "exercise, I guess"). When then asked by the ALJ "why your doctors report that you were doing work on your home, doing repairs," Brown pleaded ignorance as to "what type of repairs you're referring to," and the ALJ provided no clarification. *Id.* Although the relevant medical records did not, in fact, discuss "home *repairs*" or define "exercise" as anything other than walking, the Second ALJ Decision penalized Brown for being dishonest at the hearing.

Other instances of inaccuracy and unreasonableness in the ALJ's adverse credibility finding include the following, as detailed above: summarily concluding that Brown's second ALJ hearing rating of his lower back pain, as a six to eight out of ten on the pain scale, was incompatible with medical records reflecting that injections had afforded him some temporary relief; falsely accusing Brown of abandoning his claim of left shoulder pain after the first ALJ hearing; and using Brown's decision not to have the surgery recommended by Dr. McMillan as proof of the nonseverity of Brown's pain, in flagrant disregard of Brown's first ALJ hearing testimony that he declined the surgery on the advice of Dr. Grier. *See* Second ALJ Decision 10-11. The ALJ also improperly relied on his own observations and medical judgments in finding that — because Brown was able to sit through the second ALJ hearing, take a certain psychological test (the MMPI-II), and manage his own money — his pain was not as limiting as he claimed. *Id.* at 13, 18, 20. In so doing, the ALJ impermissibly substituted his lay opinions for the

37

judgments of medical professionals who had treated and examined Brown over many years. *See, e.g.*, *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) (recognizing that an "ALJ erroneously exercised an expertise he did not possess" — there, "in the field of orthopedic medicine").

In these circumstances, the ALJ erred by crediting Dr. Jonas and rejecting the opinions of Brown's treating and examining sources that, because of his chronic pain and mental impairments, Brown could not persist through an eight-hour workday. For that reason alone, we are obliged to vacate and remand for further proceedings.[6]

---

[6] Although our decision does not rely on it, we note the discussion in Brown's opening appellate brief of district court decisions looking unfavorably upon opinions offered by Dr. Jonas in social security cases. *See* Br. of Appellant 39-41. Brown focuses on the decision in *Creekmore v. Colvin*, which, like this matter, was adjudicated in the District of South Carolina, albeit by a different district judge. *See* No. 5:14-cv-03019 (D.S.C. Aug. 12, 2015), ECF No. 27 (Gergel, J.). The *Creekmore* decision observed:

> In the course of reviewing the case law regarding Dr. Jonas' testimony, the Court came across what appeared to be a troubling pattern of the Social Security Administration repeatedly utilizing Dr. Jonas to attack the opinions and treatment of claimants' treating physicians. Many of these cases where Dr. Jonas testified against the claimant involved, like this matter, a reversal of an earlier denial of Social Security disability by a district court and remand to the agency for a new administrative hearing. The frequency of Dr. Jonas' testimony on behalf of the Social Security Administration and against the claimant and his likely significant compensation for these services should be fully disclosed because they may be highly relevant to the weight and credibility given to Dr. Jonas' opinions. The Court would look with grave concern on the use by the Social Security Administration of a "hired gun" expert to defeat the claims of potentially deserving claimants by systematically attacking the opinions and treatment of their treating physicians.

*Id.* at 13-14 (footnote omitted).

## C.

Finally, we identify other errors committed by the ALJ in assessing the medical opinion evidence as part of his RFC determination, so that those errors are not repeated on remand. *See Bird v. Commissioner*, 699 F.3d 337, 342-43 (4th Cir. 2012) (considering nondispositive issues because they would "arise again on remand before the ALJ"). First of all, the ALJ erred in failing to acknowledge and assess the opinion of pain management specialist Dr. McMillan, upon his examination of Brown in July 2007, that "MRI examination documents far right lateral disc herniation and foraminal compression of nerve root at L4-5, *anatomically appropriate to explain symptoms*." *See* A.R. 244 (emphasis added). Pursuant to the relevant regulation, the ALJ was required to "evaluate every medical opinion" presented to him, "[r]egardless of its source." *See* 20 C.F.R. § 404.1527(c). What Dr. McMillan provided — including his interpretation of the MRI and conclusion that it showed an impairment consistent with Brown's complaint of pain — was certainly a "medical opinion" that the ALJ was obliged to consider. *See id.* § 404.1527(a)(1) (defining "medical opinions" to include "statements from [licensed physicians] that reflect judgments about the nature and severity of your impairment(s), including your symptoms"). The ALJ's error is particularly noteworthy in light of his conclusion that the objective medical evidence did not reasonably support the claimed intensity and frequency of Brown's pain.

Additionally, the ALJ's conclusion that there was insufficient medical evidence to corroborate Brown's claim of pain is incongruous with the ALJ's finding that Brown suffered from a severe somatoform disorder. As previously explained, a somatoform

disorder is a psychiatric disorder that causes unexplained physical symptoms, including pain. That is, there are no objective physical indicators of pain caused by a somatoform disorder, and yet that pain is genuine and may be disabling. *See Carradine*, 360 F.3d at 754 (explaining that a diagnosis such as somatoform disorder reflects "merely that the source of [a social security applicant's] pain is psychological rather than physical," and does not thereby "disentitle the applicant to benefits"). Accordingly, the ALJ erred by ignoring Brown's somatoform disorder — that the ALJ had theretofore found to exist — in making the RFC determination. That error, like the error in failing to assess Dr. McMillan's opinion, must not be repeated on remand.[7]

V.

Pursuant to the foregoing, we vacate the judgment of the district court and remand with instructions for that court to remand for further proceedings.

*VACATED AND REMANDED*

---

[7] Notably, Brown raised an additional ground for vacatur in both the district court proceedings and this appeal: that the ALJ erred in his RFC determination by failing to account for the limited dexterity in Brown's hands and fingers. According to Brown, the ALJ should have credited the evidence of vocational evaluator Randy Adams, who administered a dexterity test in August 2010 and deemed Brown to be unsuitable for any job "requir[ing] him to utilize his hands and fingers on a repetitive basis and [to] manipulat[e] small parts." *See* A.R. 191. The ALJ instead found that Brown could frequently handle and finger based on evidence that he "collect[ed] coins," "look[ed] at the coins with a magnifying glass," and "use[d] a computer." *See* Second ALJ Decision 22. Considering that Brown testified to owning merely "a few coins," to just occasionally looking at "pocket change" with a magnifying glass, and to being able to use a computer only "a little" and only without a "regular mouse," *see* A.R. 58, 481, that aspect of the ALJ's RFC determination must be revisited.

NIEMEYER, Circuit Judge, dissenting:

In denying Brown's claim for disability benefits, the ALJ considered the medical evidence and evaluated it together with Brown's own extensive testimony. While the ALJ concluded that Brown suffered from several impairments that could reasonably be expected to cause his alleged symptoms, he also concluded that Brown's testimony about "the intensity, persistence and limiting effects" of those symptoms was exaggerated and materially incredible. The ALJ went into substantial detail, pointing out discrepancies between Brown's statements and other evidence, including the objective medical evidence. At bottom, because I conclude that the ALJ's conclusions were supported by substantial evidence, I would affirm.